**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA**

| | |
|---|---|
| In re<br><br>**JOSHUA RICHARD EWING**,<br><br>Debtor. | Case No. **17-60803-13** |

**MEMORANDUM OF DECISION**

**INTRODUCTION**

At Butte in said District this 28th day of February, 2018.

Before the Court is the question of confirmation of the Third Amended Plan Chapter 13 plan (the "Plan"), ECF No. 65, of debtor Joshua Richard Ewing ("Debtor").[1] An objection to confirmation was filed by Debtor's grandfather and secured creditor Adam Frederick Dahlman ("Dahlman"), ECF No. 70, (the "Objection"). An evidentiary hearing on confirmation was held on February 2, 2018.

The parties presented evidence on confirmation. Although no exhibits were admitted, Debtor and his uncle, Steve Dahlman testified. At the conclusion of the hearing, confirmation of the Plan was taken under advisement. This Decision constitutes the Court's findings of fact and conclusions of law under Rules 9014 and 7052.

**FACTS**

**A. Pre-petition events**

Debtor obtained a loan from Stockman Bank of Montana. Debtor executed loan documents that included, a promissory note, agricultural loan agreement, and agricultural

---

[1] Unless otherwise indicated, all statutory references, including those to chapter and section, are to the Bankruptcy Code, Title 11, U.S. Code §§ 101–1532, and all rule references are to the Federal Rules of Bankruptcy Procedure.

1

security agreement, (the "Loan Documents"). A Uniform Commercial Code Financing Statement and Montana Effective Financing Statement were also filed with the Montana Secretary of State. These filings had blanket collateral descriptions that included equipment, crops, farm products, farm equipment, rights to payment, and payments under any governmental agricultural diversion programs.

Dahlman agreed to guaranty repayment of this loan. At some point after obtaining the loan, Debtor was unable to make the payments required under the loan as a result of an injury he suffered in connection with work he was performing. As a result, Stockman enforced the guaranty against Dahlman. Dahlman paid off the loan balance and Stockman assigned all of the loan documents to him.

Dahlman initiated proceedings in state court seeking a judgment and possession of the collateral during the pendency of those proceedings. Within those proceedings, Dahlman alleged that he "holds a first perfected security interest in and to the Collateral."[2] In a later proceeding, the state court entered an order finding that "Dahlman asserted a prima facie case establishing he has a perfected security interest in the collateral that is subject of this action."[3] While the state action was pending, Debtor filed his bankruptcy petition.

### B. Debtor's Bankruptcy

Debtor filed a voluntary chapter 13 petition, schedules and statements on August 10, 2017. The Claims Register reflects 5 creditors, including Debtor's parents have filed proof of claims. Debtor is employed as a school bus driver, as an insurance adjustor, and is paid for labor

---

[2] *See* Dahlman Proof of Claim 3-1, Part 2, 33 at ¶3.

[3] *Id* page 38. The Court cannot reconcile this conclusion with the record before it, a record that includes Dahlman's concession that he did not have a perfected security interest in at least 15 pieces of collateral.

he performs on his parents' farm. Debtor's family has been in agricultural operations in Montana for generations. Dahlman is Debtor's grandfather. Witness Steve Dahlman is Debtor's uncle and is experienced in farm operations.

Debtor's physical assets include various pieces of farm equipment including a 1997 John Deere Mo. 9600 Combine; 1996 John Deere 30' Mo. 930R Combine Header; Concord Mo. 4812 Air Drill-Seeder; Concord Mo. AS-3400 Air Drill-Cart; and a F/S 70' 400 Gal. Honda 3.0 Engine Sprayer (collectively referred to as the "Farm Equipment"). Along with the Farm Equipment, Debtor owns a multitude of vehicles. Debtor also has an insurance claim against RCIS, which is the subject of arbitration (the "Arbitration Claim"). Dahlman has a security interest in any settlement payment to Debtor related to the Arbitration Claim.

### 1. Dahlman's Proof of Claim

Dahlman filed a proof of claim prior to the claims bar date indicating that he was owed $155,000.00, and that his claim was fully secured.[4] Debtor filed an objection to Dahlman's claim, which the Court sustained in part, after notice and a hearing, by Order entered on December 11, 2017 (ECF No. 46), and allowed Dahlman a secured claim in the amount of

---

[4] The singular basis for Dahlman's assertion of secured status was the assignment of the loan documents from Stockman Bank. Thus, it appears that he as the guarantor arranged for the loan documents to be assigned to him as part of a separate transaction between him and Stockman Bank.

3

$14,900, secured by certain farm equipment.[5] The remainder of Claim 3 was allowed as an unsecured nonpriority claim.[6]

## 2. The Plan

The Plan provides for monthly payments in the amount of $200 for the first 12 months and $1,000 per month for the remainder of the 60-month plan term. Total funding under the Plan is $50,400. The Plan pays Dahlman's allowed secured claim of $14,900 as an impaired secured claim at an interest rate of 5%, and provides for a distribution to creditors with allowed unsecured claims of at least $23,730.

Debtor's Plan is predicated on his completion of custom farming for his parents at their farm. Initially, Debtor will custom farm his parents' 1,200 acres. He will plant 50% of the land in crops and 50% will be left fallow. Although two other parties have expressed interest in retaining Debtor to perform custom farming, they have not yet committed. Debtor does not have a written farming agreement with his parents or anyone else. Generally, there are no written agreements for custom farming in the area Debtor plans to conduct his operations.

Debtor's sprayer, tractor, and seeder are all operational. Although Debtor's combine needs repairs, he can perform those repairs himself, prior to harvest and estimated that the

---

[5] The determination of the value of the secured claim under Section 506(a) was based on evidence introduced at the hearing on the objection. The Order on the objection stated as follows:

> Ewing testified as to his opinion of the values of these five pieces of farm equipment, and counsel for both sides agreed on the record at the hearing that the total value of this farm equipment is $14,900. Based on the parties' agreed valuations, this Court allowed Dahlman's Proof of Claim No. 3 as a secured claim in the amount of $14,900 secured by the farm equipment, and the remainder Proof of Claim 3 will be allowed as an unsecured nonpriority claim.

ECF No. 48 at 3.

[6] No notice of appeal of ECF No. 46 was filed by Dahlman within the 14 day period prescribed by Rule 8002(a)(1) & (b)(1). On January 30, 2018, Dahlman filed a motion for relief from the Order reducing his secured claim (ECF No. 73) and supporting memorandum based on Fed. R.Civ. P. 60(b)(1) for mistake. The Chapter 13 Trustee (the "Trustee") filed an objection and that contested matter is scheduled for hearing on March 2, 2018.

maximum cost of repairs would be $6,000. Under the Plan Debtor intends to apply three fallow applications, three chemical applications, two crop spraying applications, one seeding application, and one harvest on his parents' farm. Debtor estimated his gross income for the first 600 acres as $35,500, and that his expenses will total approximately $16,500, leaving an estimated profit of $16,000 which will enable him to make the $1,000 monthly Plan payment. Debtor itemized his custom farming expenses as fuel, insurance, and an estimate for repairs based upon an average of his previous 4 years of annual repair expenses. Although this 4 year analysis did not include the cost of repairing the combine, Debtor's income from his other employment as a school bus driver, and as an insurance adjustor will be available to pay for any unanticipated expenses that he might suffer.

Debtor's approach to farming differs from his Uncle Steve Dahlman's approach in a couple of ways. First, Debtor does not operate new equipment. Steve Dahlman testified that older equipment has a higher probability of breaking down. Depending on the timing of an equipment breakdown, an equipment breakdown could negatively impact overall crop yield.

Second, unlike Debtor, Steve Dahlman does not have outside employment. According to Steve Dahlman, Debtor's outside employment may affect his ability to custom farm because spraying must be done early in the morning or late in the evening. Debtor's other employment may cause him to miss an opportunity to spray because of a rain or heat event, which reduces yield.

And, third, if Steve Dahlman was custom farming he would obtain all required insurance and bonding protection associated with commercial chemical application in custom farming. While Debtor has determined which insurance he believes he needs and the cost associated with it, and if there are additional coverages, or bonding that are required he will obtain those as well.

Steve Dahlman farms approximately 10,000 acres on a farm that he owns, making a comparison of his farming practices to those of Debtor's smaller custom farming operations problematic. Despite the problems with comparing these different operations for feasibility purposes, Steve Dahlman acknowledged that farming is subject to many variables that make predictions of relative prospective success difficult.[7]

### 3. The Objection

The Objection has four sub-parts that contend as follows: (i) the Plan is speculative and not feasible under 11 U.S.C. § 1325(a)(6); (ii) Debtor's Petition and Plan were not filed in good faith under 11 U.S.C. § 1325(a)(3) & (7); (iii) the Plan cannot be confirmed because it is in violation of § 1325(a)(5) of the Bankruptcy Code in that Dahlman has not accepted the Plan, and Debtor proposes to retain the property constituting the collateral of Dahlman; and, (iv) the Plan cannot be confirmed because Dahlman has a secured interest in the arbitration proceeds described in paragraph 11 of the Debtor's Plan and as the only creditor entitled to these proceeds, Dahlman should be given the authority to settle the arbitration claim on his own behalf.  Each of the individual objections comprising the Objection are considered and discussed below.

At the hearing, the Court asked counsel for any authority that supported or corresponded to this specific objection.  In response, Dahlman made reference to discussions with the Trustee. The Trustee conceded that Dahlman had an interest in the RCIS insurance claim that was superior to the interest of the Trustee, and that under the circumstances the Trustee would not object to either the surrender, or abandonment of the claim to Dahlman.  Debtor's counsel advised that although he had not spoken with his client, he did not anticipate any objection by his

---

[7] Debtor's uncle Steve Dahlman found himself in the unenviable position of having to testify as a witness for his father, adverse to his nephew, presumably for the purpose of demonstrating that the Plan was not feasible.  Dahlman did not testify.

6

client to surrender of the claim. However, because counsel was appearing by video and his client was in the courtroom there was no effective way for Debtor and counsel to discuss surrender or abandonment.

### 4. The Trustee's Consent

The Trustee filed a consent to the Plan that represented as follows:

> The Plan has been proposed in good faith and not by any means prohibited by law. The Plan represents the best efforts of the Debtor and the Debtor appears to be able to make the payments provided for in the Plan and to otherwise comply with the Plan.

ECF No. 68.

## APPLICABLE LAW & DISCUSSION

Section 1325(a) of the Code lists the standards for confirmation of chapter 13 plans. Although both Debtor and the Trustee contend that all of the requirements for confirmation in § 1325(a) have been satisfied, Dahlman objects to confirmation arguing that:

(i) the Plan is speculative and not feasible under 11 U.S.C. § 1325(a)(6);

(ii) Debtor's Petition and Plan were not filed in good faith under 11 U.S.C. § 1325(a)(3) & (7);

(iii) the Plan cannot be confirmed because it is in violation of § 1325(a)(5) of the Bankruptcy Code in that Dahlman has not accepted the Plan, and Debtor proposes to retain the property constituting the collateral of Dahlman; and,

(iv) the Plan cannot be confirmed because Dahlman has a secured interest in the arbitration proceeds described in paragraph 11 of the Debtor's Plan and as the only creditor entitled to these proceeds, Dahlman should be given the authority to settle the arbitration claim on his own behalf.

ECF No. 70.

It is well established law in this Circuit that for a bankruptcy court to confirm a plan, "each of the requirements of section 1325 must be present and the debtor has the burden of proving that each element has been met." *Barnes v. Barnes (In re Barnes)*, 32 F.3d 405, 407 (9th

Cir. 1994) (citing cases); *Drummond v. Welsh (In re Welsh)*, 465 B.R. 843, 847 (9th Cir. BAP 2012); *In re Weik*, 526 B.R. 829, 834 (Bankr. D. Mont. 2015). Section 1325(a)(1) requires confirmation of a plan if "the plan complies with the provisions of this chapter and with the other applicable provisions of this title." *Andrews v. Loheit, (In re Andrews)*, 49 F.3d 1404, 1407-08 (9th Cir. 1995). Therefore, the Debtor has the burden of proof on all elements of confirmation. *Meyer v. Hill, (In re Hill)*, 268 B.R. 548, 552 (9th Cir. BAP 2001). After considering the applicable law and evidence presented at the hearing, the Objection is overruled for the reasons set forth below.

### A. Dahlman's interest in the arbitration proceeds does not prevent confirmation

The Plan's treatment of the arbitration proceeds does not represent a cognizable basis for denying confirmation of the Plan. Dahlman failed to present any evidence or identify any authority that supports his contention that, "the Plan cannot be confirmed because Dahlman has a secured interest in the arbitration proceeds described in paragraph 11 of the Debtor's Plan and as the only creditor entitled to these proceeds, Dahlman should be given the authority to settle the arbitration claim on his own behalf." At the hearing, Dahlman did not identify any authority that supported this objection. Instead, Dahlman represented that this objection was premised on discussions with the Trustee regarding abandonment or surrender of the claim to Dahlman. Notwithstanding the Trustee's concessions at the hearing, nothing presented to the Court either surrenders or abandons the arbitration proceeds. At its best, this objection appears to be premised on discussions that never blossomed into an agreement between the Trustee, Debtor and Dahlman. Absent a legal or factual basis for this objection, it is overruled.

B. **Consideration of the evidence demonstrates the Plan is feasible under § 1325(a)(6)**

The feasibility requirement found at § 1325(a)(6) provides for confirmation if "the debtor will be able to make all payments under the plan and to comply with the plan." *In re Bassett*, 413 B.R. 778, 788 (Bankr. D. Mont. 2009). A debtor does not need to prove that his or her plan is guaranteed to be successful. *In re Mycek*, 2013 WL 9994332, *4 (C.D. Cal 2013). To demonstrate that a plan is feasible, chapter 13 debtors must show that their plan has a "reasonable chance of success." *Mycek*, 2013 WL 9994332, *3, quoting *Bassett*, 413 B.R. at 788 (citing *In re Hungerford*, 19 Mont. B.R. 103, 117 (Bankr. D. Mont. 2001), 2001 WL 36211305, *8. A debtor in a chapter 13 case need not prove that the plan is guaranteed to be successful. *Mycek*, 2013 WL 9994332, *4, citing *In re Anderson*, 18 B.R. 763, 765 (Bankr. S.D. Ohio 1982). A bankruptcy court's determination on feasibility should be based on the facts before the court at the time of confirmation rather than hypothetical scenarios. *Id*.

The feasibility provision at § 1325(a)(6) requires that "the debtor will be able to make all payments under the plan and to comply with the plan." *Bassett*, 413 B.R. at 788. Debtor's Plan provides for monthly payments in the amount of $200 for the first twelve months of the Plan, and then $1,000 monthly payments for months 13-60. Debtor's Schedules I and J show that the Debtor has almost the $200 from his farm labor income alone, without counting his income from driving a school bus and as a crop adjuster, or his income from custom farming which will commence after he begins spraying.

This Debtor has taken on additional employment outside the farm driving a school bus and as a crop adjuster. His custom farming operation is on his parents' farm. Dahlman's own witness testified that custom farming agreements in their region generally are not in writing, so the absence of a written agreement is of no consequence, despite Dahlman's focus on this at the

9

hearing. Debtor's Plan has a cushion to pay for unexpected expenses, including insurance and bonding requirements. Debtor testified that he has and will continue to pursue any licenses necessary for the application of chemicals to the fields. Debtor's testimony that he was capable of completing mechanical repairs on his farm equipment, was not controverted. Debtor has recovered from the injury which caused his default on the Stockman loan. If he obtains additional custom farming work from interested parties, he could earn additional income to pay creditors. The Trustee's consent concludes that Debtor's Plan is feasible, which this Court considers significant.

"In accord with the philosophy of the bankruptcy code that debtors are entitled to at least one chance for rehabilitation, this Bankruptcy Court holds that Debtors will be able to make the payments called for by their Chapter 13 Plan, assuming good weather, fair crop prices, and a market for Debtors' crops." *In re Hines*, Bkrtcy.D.S.D.1980, 7 B.R. 415 at 419. At its best, at the hearing, Dahlman's cross examination of Debtor focused on prospective events that might occur, and the impact these events might have on feasibility. For example, Dahlman questioned Debtor how an injury or a hailstorm would impact his reorganization efforts.[8] If such speculative inquiries were relevant, it is hard to imagine any chapter 13 plan that would be feasible. No debtor can guarantee that their employment will not be interrupted by injury at some point during the plan term, and feasibility does not require such an extraordinary showing. Instead, Debtor must demonstrate that he will be able to make all payments under the plan and to comply with the plan. After considering the evidence and the Trustee's consent, the Court finds that the Debtor has satisfied his burden of proof on the issue of feasibility under § 1325(a)(6) by a preponderance of the evidence.

---

[8] This line of questioning made reference to prior farm operations by Debtor that were not successful at least in part according to Debtor because of an injury he suffered that prevented him from working, and a hail storm.

### C. The Plan does not violate § 1325(a)(5)

The Plan's treatment of the Dahlman claim is governed by § 1325(a)(5). Section 1325(a)(5)(B) has been explained as permitting the "cram down" option, which functions as follows:

> the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, see § 1325(a)(5)(B)(i), and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, i.e., the present value of the collateral, see § 1325(a)(5)(B)(ii).

*Associates Commercial Corp. v. Rash*, 520 U.S. 953, 957 117 S.Ct. 1879 at 1882-1883, 138 L.Ed.2d 148 (1997). Under the Plan, Debtor will retain Dahlman's collateral, Dahlman will retain his lien, and Dahlman will receive payments of $14,900 with an interest rate of 5%. In a prior proceeding this Court determined that Dahlman had a secured claim in the amount of $14,900. At that proceeding, the only evidence of the value of the Dahlman collateral was introduced by Debtor. Further, no evidence was introduced at the confirmation hearing on this issue. Here, the Plan is consistent with the cram down option. Thus, Dahlman's objection under § 1325(a)(5) is overruled.

### D. No evidence of bad faith by Debtor in connection with filing either the petition or the Plan

The Code imposes 2 independent good faith obligations on a chapter 13 debtor at §§ 1325(a)(3) and § 1325(a)(7). First, § 1325(a)(3) requires that "the plan has been proposed in good faith and not by any means forbidden by law." And, § 1325(a)(7) requires that "the action of the debtor in filing the petition was in good faith." In determining whether a petition or plan is filed in good faith the court must review the "totality of the circumstances." *In re Khan*, 846 F.3d 1058, 1065 (9th Cir. 2017); *Leavitt v. Soto*, 171 F.3d 1219, 1224-25 (9th Cir.1999); *In re Snyder*, 420 B.R. 794, 804 (Bankr. D. Mont. 2009). The Ninth Circuit did not decide with

precision what qualifies as bad faith, but emphasized that the debtor's conduct must in fact be atypical. *Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 773 (9th Cir. 2008), quoting *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S.Ct. 1105, 1112 at n. 11, 166 L.Ed.2d 956 (2007).

In *Leavitt*, 171 F.3d at 1224, the Ninth Circuit held that in determining whether a chapter 13 plan was proposed in good faith a bankruptcy court should consider (1) whether the debtor misrepresented facts in his or her petition or plan, unfairly manipulated the Code, or otherwise filed his or her petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor intended to defeat state court litigation; and (4) whether egregious behavior is present. The *Leavitt* assessment remains in use in this circuit. *Khan*, 846 F.3d at 1065. These four factors are not all-inclusive, and the court need not find that every factor is shown by the evidence in order to conclude that bad faith has been shown. *Khan*, 856 F.3d at 1066.

### 1. The filing of the petition was in good faith

Consideration of the *Khan* factors does not support finding that Debtor filed his petition in bad faith. At the confirmation hearing, there was virtually no evidence to support a finding of bad faith in connection with the filing of the petition. To date, Debtor's conduct has not been egregious in any sense. To the contrary, Debtor has diligently moved his case towards confirmation of a plan. Debtor has no history of filings and dismissals. And, there is no indicia that Debtor misrepresented facts in his petition, unfairly manipulated the Code, or otherwise filed his petition in an inequitable manner.

Although Debtor filed bankruptcy in response to Dahlman's actions before the state court, that factor alone, under a totality of circumstances test, does not in this case tip the scales

towards a finding of bad faith. Debtor's candor and demeanor when he testified, along with his willingness to commit his earnings from multiple sources towards funding his plan, is wholly inconsistent with Dahlman's contention that Debtor filed his petition in bad faith. Instead, the evidence and record shows Debtor filed his petition in good faith.

### 2. The filing of the Plan was in good faith

Similarly, consideration of the *Khan* factors does not support finding that Debtor filed his Plan in bad faith. The Plan represents Debtor's best effort to reorganize, and the Plan is consistent with the requirements of the Code. Dahlman introduced no evidence that the Debtor misrepresented facts in his Plan, unfairly manipulated the Code, or otherwise filed his Plan in an inequitable manner. Debtor proposes to pay Dahlman's secured claim in full and Dahlman will receive the largest pro rata share of the distribution to unsecured creditors. Dahlman's treatment under the Plan is consistent with the Code. As a result, and absent evidence indicative of bad faith, Debtor's Plan was filed in good faith.

## CONCLUSION

At best, the evidence introduced at the hearing and the record in this case show Debtor does not have the benefit of brand new equipment, the latest technology, or the ongoing support of his extended family, and was on the cusp of having his farm equipment seized by his grandfather, Dahlman, pre-petition. Although this evidence demonstrates Debtor may encounter challenges over the term of the Plan, it does not establish Debtor will be unable to make all payments under the Plan or comply with the Plan's terms.

Allegations of bad faith in connection with the filing of a petition or plan are serious and should not be made cavalierly. Relief under the Code is premised on a debtor's honesty and allegations of bad faith represent a serious challenge to that premise. Parties considering

whether to make such allegations must carefully consider the *Leavitt* factors and be prepared to present evidence of at least one or more of those factors, or other indicia of bad faith to this Court at any hearing involving such allegations. To do otherwise will be a futile exercise.

For the reasons stated above, the Court will enter a separate order providing that Dahlman's Objection is overruled, and Debtor's Third Amended Chapter 13 Plan is confirmed.

BY THE COURT:

_____
Hon. Benjamin P. Hursh
United States Bankruptcy Court
District of Montana

14